1

2

3

4

5

6            **UNITED STATES DISTRICT COURT**

7        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8                  **FRESNO DIVISION**

9

10   **RONALD DEAN GLOVER**,                    CASE NO. 07cv0306-BTM(PCL)

11                              Petitioner,     **ORDER DENYING 28 U.S.C. § 2254
                                                PETITION FOR WRIT OF**
12        vs.                                   **HABEAS CORPUS**

13   **IVAN CLAY, WARDEN**,

14                              Respondent.

15

16

17        Petitioner Ronald Dean Glover ("Glover"), a state prisoner proceeding *pro se* and *in forma*

18   *pauperis*, seeks a 28 U.S.C. § 2254 writ of habeas corpus.  He alleges violations of his due process

19   rights associated with the  Board of Parole Hearings' ("BPH") denials of parole at his initial suitability

20   hearing in March 2004 and at his subsequent suitability hearing in May 2006.[1]  Respondent filed an

21   Answer, and Glover filed a Traverse.  After consideration of the parties' arguments,  pertinent portions

22   of the record, and controlling authority, for the reasons discussed below, the Petition is **<u>DENIED</u>**.

23   **I.      BACKGROUND**

24        A jury convicted Glover of second-degree robbery and assault with a deadly weapon in

25   Stanislaus County Case No. 267714. He was sentenced on May 18, 1992, under California's Habitual

26   Criminal Act, to an indeterminate term of 20-years to life in prison.  He was also convicted in 1992

27   ────────────

28        [1] By Order entered March 25, 2009, the undersigned District Judge denied Glover's Motion To Amend
his Petition to add claims arising from his third BPH proceeding denying him parole in 2008. Dkt Nos. 27, 30.

1   of possession of a controlled substance while in custody and received a four year consecutive term for

2   that offense.  His minimum eligible parole date was December 5, 2004.  (*See* Pet. Exh. G, 1:18-3:4.)

3   On December 11, 1995, while incarcerated on the robbery conviction, he was sentenced to eight years[2]

4   on a no contest plea to voluntary manslaughter in Case No. 25179 arising from the stabbing death of

5   victim William Tillman in 1991, to run concurrently with his sentence in Case No. 267714.

6   Glover's March 10, 2004 BPH panel concluded he was unsuitable for release because he would

7   pose an unreasonable risk of harm to the public.  (Pet. Exh. G, pp. 52-56.)  On March 14, 2005, Glover

8   filed a habeas corpus petition in Stanislaus County Superior Court challenging the parole denial as a

9   violation of his plea agreement in Case No. 25179, the voluntary manslaughter case.[3]  He argued he

10  had already served his full eight-year sentence for that crime, suggesting that was the commitment

11  offense, and the BPH should not have used that conviction to keep him confined by purportedly

12  mischaracterizing and reclassifying the crime as murder.  He sought to vacate the plea.  He also

13  challenged the conduct of the hearing, including allegedly improper consideration of statements made

14  by the District Attorney, inaccuracies recited in his criminal history, and purported factual errors

15  associated with the other underlying convictions.  (Ans. Exh. 1, Part 1, Statement of Facts, pp. 1-8.)

16  In its March 25, 2005 Order, reciting it had reviewed Glover's petition, his supplemental Points

17  and Authorities, his multiple exhibits, and the court files in Case Nos. 25179 and 267714, the Superior

18  Court stated:  "The Court hereby summarily denies the petition as being frivolous (see In re Brown

19  (1973) 9 C3d, 679) and without merit."  (Ans. Exh. 2, 1:16-22.)  The court rejected his crime

20  mischaracterization theory:   "In the Initial Parole Consideration Hearing, it is clear that the

21  commissioners understood that Petitioner's conviction in case No. 25179 was for Voluntary

22  Manslaughter resulting in the eight (8) year sentence."  (Id., 2:4-7.)  Glover presented  the California

_____

24  [2]  He received six years under CAL. PEN. CODE § 192(a), with one additional year for a weapon
    enhancement and one additional year for a prior felony prison term.

26  [3]  California permits only limited judicial review of parole decisions, authorizing the filing of a writ
    of habeas corpus.  *See* CAL. PEN. CODE §§ 1473-1508; CAL. RULES OF CT. 4.551; In re Powell, 45 Cal.3d 894,
    903 (1988). "The [BPH] acts properly in determining unsuitability, and the inmate receives all constitutional
27  process due, if the Board provides the requisite procedural rights, applies relevant standards, and renders a
    decision supported by 'some evidence.' " In re Dannenberg, 34 Cal.4th 1061, 1071 (2005) *see* In re Scott, 119
28  Cal.App.4th 871, 894-95, 897 (2004).

07cv0306

1    Court of Appeal with the same claims in a May 3, 2005 habeas petition, summarily denied on

2    May 26, 2005.  (Ans. Exhs. 3, 5.)  He presented the same claims in an August 3, 2005 habeas petition

3    to the California Supreme Court, summarily denied *en banc* on June 14, 2006.  (Ans. Exhs. 4, 6.)

4         At his May 19, 2006 Subsequent Parole Suitability hearing, the BPH panel again denied

5    Glover parole, finding he was "not suitable for parole and would pose an unreasonable risk of danger

6    to society or a threat to public safety" if released from prison.  (Pet. Exh. AA, 84:8-14.)  The panel

7    identified particular evidence in the record and recited as its reasons for denial several of the same

8    conclusions reached by the 2004 BPH panel.  (Id., pp. 84-88.)  In addition, the 2006 panel highlighted

9    Glover's disciplinary infractions since the last hearing (Id. 88:16-17) and relied on a recent and

10   unfavorable psychological report concluding if released, he would likely return to drug use and crime

11   to pay for his habit.  (Id. 89:9-16).  The panel also found he did not have viable housing plans and

12   expressed concern about his employment prospects.  (Id. 89:6-90:1.)

13        Glover filed a habeas petition in the California Supreme Court on September 25, 2006,

14   challenging the BPH's second denial of parole.  (Ans. Exh. 7.)  He contended the decision violated the

15   terms of his plea agreement in the voluntary manslaughter case, the BPH panel improperly considered

16   that conviction, and it should not have permitted victim testimony at the hearing.[4]  By Order entered

17   March 28, 2007, the court summarily denied the petition.  (Ans. Exh. 8.)  On February 26, 2007, while

18   that petition was pending, Glover filed his federal Petition.[5]  He repeated the challenges to the conduct

19   and results of his 2004 and his 2006 parole suitability hearings.[6]  There is no dispute the claims are

---

[4]  All of the challenged considerations are authorized by statute.  The panel may consider victim testimony at the hearing.  CAL. PEN. CODE §§ 3043-3043.1.  District attorneys and law enforcement agents may also participate.  CAL. PEN. CODE §§ 3041.7, 3042.  Even more comprehensively, CAL. CODE REGS. tit. 15, §§ 2281(b)-(c) permit the BPH to consider any material it deems relevant.

[5]  Respondent moved to dismiss the Petition on March 21, 2008 asserting untimeliness (Dkt No. 12), then withdrew the motion after Glover presented proof of administrative appeals.  (Dkt Nos. 13, 14, 15.)

[6]  He alleges, in particular: (1) the BPH violated due process by failing to follow their own procedures, regulations, and evidentiary rules (Dkt No. 2, Supp. P&A 1:1-8; (2) his due process rights were violated "when [BPH] used prior convictions as principal active case[]s to justify denial of parole in direct contradiction of" California law (Id. at 8:13-16); (3) the 2004 panel characterized his offense differently from his plea with elements not proven against him ((Id. at 13:9-11); (4) the state is violating "the specific performance mandates of the United States Supreme Court law on bargain pleas" (Id. at 15:17-19); (5) the use of unreliable evidence or hearsay violated due process (Id. at 21:13-15); (6) the panel should not have admitted and believed false

07cv0306

exhausted,[7] and his federal Petition was timely filed.   On November 25, 2008 this matter was reassigned from the bench of the United States District Court for the Eastern District of California to visiting District Judge Barry T. Moskowitz, United States District Court for the Southern District of California.   (Dkt No. 28.)   The case became fully briefed on August 18, 2008 with the filing of Glover's Traverse (Dkt No. 24) and ripe for review on March 25, 2009 with the denial of his Motion To Amend the Petition.   (Dkt Nos.27, 30).

## II.   DISCUSSION

### A.   Legal Standards

#### 1.   Federal Habeas Review

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.A. § 2254(a) (West 2009).   Only errors of federal law can support federal intervention in state court proceedings, and only to correct such errors.  Oxborrow v. Eikenberry, 877 F.2d 1395, 1400 (9th Cir. 1989).   Federal habeas courts are bound by states' interpretations of their own laws.  Himes v. Thompson, 336 F.3d 848, 852 (9th Cir. 2003); Estelle v. McGuire, 502 U.S. 62, 68 (1991).

Federal habeas petitions filed after April 24, 1996 are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   AEDPA establishes a "highly deferential standard for evaluating state-court rulings."  Woodford v. Visciotti, 537 U.S. 19, 24 (2002).   A federal court cannot grant a state prisoner habeas relief unless it determines a claim adjudicated on the merits in state court proceedings "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

---

statements from the district attorney, violating due process (Id. at 29:9-10); (7) lack of evidence for the panel's finding he had tumultuous relationships (Id. at 34:7-9); and (8) his "freedom interest in Penal Code Section 3041 is negated by [BPH's] assessment of crime" (Id. at 35:14-17).

[7] Respondent reserved an exhaustion objection should the Court interpret Glover's claims to encompass any "systemic issues" beyond his claims "the Board's 2004 and 2006 decisions violated his due process rights, that the Board improperly reclassified his commitment offense, violated the terms of his plea agreement, and had the wrong individuals present at his parole suitability hearing."  (Dkt No. 21, Ans. 2:21-26.)

1  proceeding."  28 U.S.C. § 2254(d); *see* <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002).  The denial of a

2  petition by the state's highest court "without comment or citation constitute[s] a decision on the merits

3  of the federal claims," and "such claims [are] subject to review in federal habeas proceedings." <u>Hunter</u>

4  <u>v. Aispuro</u>, 982 F.2d 344, 347-48 (9th Cir. 1992).  When there is no reasoned decision from the state's

5  highest court, the federal court "looks through" to the rationale of the underlying decision.  <u>Ylst v.</u>

6  <u>Nunnemaker</u>, 501 U.S. 797, 803 (1991).  A state court's adjudication on the merits "based on a factual

7  determination will not be overturned on factual grounds unless objectively unreasonable in light of

8  the evidence presented in the state court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

9  **2.   Evidentiary Hearings**

10  Glover asks for an evidentiary hearing on "all contested factual issues." (Pet. p. 19; Traverse

11  p. 35.)  An evidentiary hearing is not required on allegations that are "conclusory and wholly devoid

12  of specifics." <u>Campbell v. Wood</u>, 18 F.3d 662, 679 (9th Cir. 1994) (citation omitted).  AEDPA "now

13  substantially restricts the district court's discretion to grant an evidentiary hearing." <u>Baja v.</u>

14  <u>Ducharme</u>, 187 F.3d 1075, 1077 (9th Cir. 1999); *see* 28 U.S.C.A. § 2254(e); *see also* <u>Bragg v. Galaza</u>,

15  242 F.3d 1082, 1085, 1089-90 (9th Cir. 2001). Glover makes no showing adequate to satisfy the

16  specificity requirement, "[n]or is an evidentiary hearing required on issues that can be resolved by

17  reference to the state court record," as is the case here. <u>Id.</u>; *see* <u>Totten v. Merkle</u>, 137 F.3d 1172, 1176

18  (9th Cir. 1998).  Accordingly, the request is **<u>DENIED</u>**.

19  **3.   Liberty Interest In Parole**

20  In analyzing the procedural safeguards owed to an inmate under the Due Process Clause, "we

21  must look at two distinct elements: (1) a deprivation of a constitutionally protected liberty or property

22  interest, and (2) a denial of adequate procedural protections." <u>Biggs v. Terhune</u>, 334 F.3d 910, 913

23  (9th Cir. 2003), *citing. inter alia,* <u>McQuillion v. Duncan</u>, 306 F.3d 895, 900, 903 (9th Cir. 2002); *see*

24  <u>Board of Pardons v. Allen</u>, 482 U.S. 369, 377-78 (1987).  Respondent argues Glover has no federally

25  protected liberty interest in parole, and therefore this Court lacks jurisdiction over the Petition.  (Ans.

26  3:5-6.)  Respondent contends the only United States Supreme Court case to address due process in

27  state parole proceedings is <u>Greenholtz v. Inmates of Neb. Penal & Corr. Complex</u>, 442 U.S. 1, 11-12

28  (1979) (finding a liberty interest in a conditional parole release date was created by the structure and

1    language of the parole statute).  (Ans. 6:26-27.)  Even if the Court finds a liberty interest, Respondent

2    argues Greenholtz supports the proposition due process is satisfied when the state provides the inmate

3    an opportunity to be heard and a statement of the reasons for the decision, procedural protections

4    Glover received, warranting denial of the Petition.  (Ans. 6:28-7:8; *see* Greenholtz, 442 U.S. at 16.)

5         It is well established there is "no constitutional or inherent right of a convicted person to be

6    conditionally released before the expiration of a valid sentence," but a state can "create a liberty

7    interest protected by the due process guarantees" when its parole scheme employs "statutory language

8    [that] itself creates a protectible expectation of parole."  Greenholtz, 442 U.S. at 11-12; *see also* Allen,

9    482 U.S. 369; Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 463 (1989) ("the use of

10   'explicitly mandatory language,' in connection with the establishment of 'specified substantive

11   predicates' to limit discretion, forces a conclusion that the State has created a liberty interest"), *quoting*

12   Hewitt v. Helms, 459 U.S. 460, 472, 466 (1983) (protected liberty interests "may arise from two

13   sources -- the Due Process Clause itself and the laws of the States").[8]  The Ninth Circuit has repeatedly

14   held California's parole statute gives rise to a cognizable liberty interest in a parole release date

15   protected by the procedural safeguards of the Due Process Clause.[9]  *See, e.g.*, Biggs, 334 F.3d at 914;

16   Sass v. Cal. Bd. Of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006) (a California prisoner serving

17   a sentence of a term of years to life with the possibility of parole has a protected liberty interest in

18   release on parole and consequently a right to due process in parole suitability proceedings).;

19   McQuillion v. Duncan, 306 F.3d 895, 901-02 (9th Cir. 2002) (a parole rescission case recognizing a

20   California state prisoner serving a life sentence has a cognizable liberty interest in release on parole,

21   based on its determination California's parole scheme closely resembles those interpreted in

22   Greenholtz and Allen); *see* CAL. PEN. CODE § 3041(b) ("The panel or the board . . . ***shall set a release***

23   ***date unless*** it determines that the gravity of the current convicted offense or offenses, or the timing

24   and gravity of current or past convicted offense or offenses, is such that consideration of the public

---

25

26        [8]  The Hewitt mandatory language methodology for finding a protected liberty interest was modified by Sandin v. Connor, 515 U.S. 472, 479-84 (1995) in the regulation of conditions of confinement context.

27        [9]  In California, "prior to [an] inmate's minimum eligible parole release date a panel of two or more
28   commissioners or deputy commissioners shall again meet with the inmate **and shall normally set a parole release date.**"  CAL. PEN. CODE § 3041(a) (emphasis added).

safety requires a more lengthy period of incarceration for this individual, and that a parole date,

therefore cannot be fixed at this meeting . . . .") (emphasis added). "California Penal Code section

3041 vests . . .all . . . California prisoners whose sentences provide for the possibility of parole with

a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that

is protected by the procedural safeguards of the Due Process Clause." Irons v. Carey, 505 F.3d 846,

850-51 (9th Cir.), reh'g denied, 506 F.3d 951 (9th Cir. 2007), citing Sass, 461 F.3d at 1128, 1126-27.

This Court is bound by Ninth Circuit authority.  California's statutory parole scheme satisfies the

"liberty interest" prong of the due process analysis.

### 4.    Suitability Hearings Standard Of Review

The second prong of the due process analysis requires procedural safeguards be observed

before the state may deprive an inmate of the protected liberty interest in parole.  That prong is

satisfied if (1) the inmate is afforded an opportunity to be heard and, if denied parole, informed of the

reasons underlying the decision, and (2) "some evidence" supports the decision to grant or deny

parole.  See Sass, 461 F.3d at 1129 (adopting in the parole context the "some evidence" standard for

disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454 (1985)).  The Hill Court

held "revocation of good time does not comport with 'the minimum requirements of due process,'

unless the findings of the prison disciplinary board are supported by some evidence in the record."

Hill, 472 U.S. at 454 (citation omitted).  "[T]he relevant question is whether there is any evidence in

the record that could support the conclusion reached by the" board.  Id. at 455 (emphasis added).  The

record substantiates Glover had an opportunity to be heard and was informed of the reasons for the

parole denials.  Accordingly, the sole issue is whether "some evidence" supports those decisions.

Respondent acknowledges the Ninth Circuit has recognized a due process right to the

application of the same "some evidence" standard in the parole context as in the prison disciplinary

hearing context.[10]  (Ans. pp. 7-8, citing Biggs, 334 F.3d 910, Sass, 461 F.3d at 1128, and Irons, 505

---

[10]   "[D]ue process requires that 'some evidence' support the parole board's determination," and the evidence relied on "must possess 'some indicia of reliability.' "  Biggs, 334 F.3d at 915, quoting Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987) (adopting the "some evidence" standard set forth in Hill, 472 U.S. 445); see McQuillion, 306 F.3d at 904; Sass, 461 F.3d at 1128-29; Irons, 505 F.3d at 851; see also Caswell v. Calderon, 363 F.3d 832, 838-39 (9th Cir. 2004).

1  F.3d at 851 ("the Supreme Court had clearly established . . . that a parole board's decision deprives

2  a prisoner of due process with respect to this interest if the board's decision is not supported by 'some

3  evidence in the record' . . . or is 'otherwise arbitrary' "), *quoting* <u>Sass</u>, 461 F.3d at 1128-29, *citing* <u>Hill</u>,

4  472 U.S. at 457.)  Nevertheless, Respondent argues the parole context and the disciplinary context are

5  distinct, and "the Ninth Circuit's application of the some evidence standard  to parole decisions is

6  improper under AEDPA" absent "clearly established federal law" articulated by the United States

7  Supreme Court.  (<u>Id.</u>)  Respondent argues even if this Court reaches the merits of Glover's federal

8  Petition, the decision of the Superior Court finding the claims frivolous on habeas review was not an

9  unreasonable application of the <u>Hill</u> "some evidence"standard.  (Ans. 8:19-24.).

10  Even though the Supreme Court may not have clearly established the "some evidence"

11  standard for review of parole suitability determinations, this Court is bound by Ninth Circuit decisions

12  recognizing a liberty interest in parole and applying the <u>Hill</u> standard in that context.[11]  The California

13  Supreme Court has also adopted the <u>Hill</u> standard to review parole decisions.  <u>In re Rosenkrantz</u>, 29

14  Cal. 4th 616 (2002).  The "some evidence" analysis is "framed by the statutes and regulations

15  governing parole suitability determinations in the relevant state."  <u>Irons</u>, 505 F.3d at 851 ("[W]e must

16  look to California law to determine the findings that are necessary to deem a prisoner unsuitable for

17  parole, and then must review the record in order to determine whether the state court decision holding

18  that these findings were supported by 'some evidence' in [the petitioner's] case constituted an

19  unreasonable application of the 'some evidence' principle articulated in <u>Hill</u>, 472 U.S. at 454").

20  The guidelines and criteria for parole consideration applied to habitual offenders sentenced

21  to life terms under CAL. PEN. CODE § 667.7 (governing persons convicted of a felony in which the

---

23  [11]  The Ninth Circuit is likely to further clarify application of the "some evidence" standard in parole suitability determinations when the pending *en banc* review of <u>Hayward v. Marshall</u>, 512 F.3d 536 (9th Cir.), *reh'g en banc granted*, 527 F.3d 797 (9th Cir. May 16, 2008), is decided.  Respondent had  moved to stay this matter pending issuance of the mandate in <u>Hayward</u>.  Dkt No. 16.  A number of courts have granted stay requests in federal habeas cases arising from parole denials pending the <u>Hayward</u> decision, which may be particularly apt with respect to proper treatment of immutable factors (such as the circumstances of the commitment offense) as their predictive value for assessing present or future dangerousness presumably decreases over time.  However, not only was Respondent's motion to stay on that basis denied by Order entered June 18, 2008 (Dkt No. 19), but also other Ninth Circuit authority binding on this Court permits it to reach the merits in Glover's factual circumstances and to readily resolve his claims, particularly as his panel relied on evidence supporting several of the codified unsuitability factors beyond merely the commitment offense.

person inflicts great bodily injury or who personally uses force likely to produce great bodily injury) appear at CAL. CODE REGS. tit. 15, §§ 2420, *et seq.*   "Regardless of the length of time served, a prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." CAL. CODE REGS. tit. 15, § 2422(a).  The BPH has broad discretion in deciding what weight to give the factors, but "must apply detailed standards when evaluating whether an individual is unsuitable for parole on public safety grounds." In re Dannenberg, 34 Cal.4th 1061, 1071,1080, 1096 n. 16 (2005); Rosenkrantz, 29 Cal.4th at 677 (the BPH's discretion is circumscribed by the requirement "the decision must reflect an individualized consideration of the specific criteria and cannot be arbitrary and capricious").  The panel must consider both circumstances tending to show unsuitability [12] and circumstances tending to show suitability in the particular case.[13]  "[I]t is not enough that there is some evidence to support the factors cited for the denial; that evidence must also rationally support the core determination required by the statute before parole can be denied, *i.e.*, that a prisoner's release will unreasonably endanger public safety."  In re Roderick, 154 Cal.App.4th 242, 263, 264 (2007) (the Board, in its decisions, must articulate reasons that are grounded in evidence *and* rationally related to the statutory basis for denial), *citing* In re Lee, 143 Cal.App.4th 1400, 1409 (2006) ("Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release

---

[12] "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2422(c)." CAL. CODE REGS. tit. 15 § 2421. Guideline circumstances tending to show unsuitability include, as pertinent here:  (1) the heinousness or cruelty of the commitment offense, in consideration of such factors as multiple victims "attacked, injured or killed in the same or separate incidents;" "the victim was abused, defiled or mutilated during or after the offense;" the offense "was carried out in manner which demonstrates an exceptionally callous disregard for human suffering;" (2) the prisoner's previous record of violence, "particularly if the prisoner demonstrated serious assaultive behavior at an early age;" (3) unstable social history in relationships with others; (4)  psychological factors; and (5) institutional behavior engaging in serious misconduct while incarcerated.  CAL. CODE REGS. § 2281(c)

[13] "A parole date shall be set if the prisoner is found suitable for parole under Section 2422(d)." CAL. CODE REGS. tit. 15 § 2421. Guideline circumstances tending to show suitability include:  (1) no juvenile record; (2) stable social history; (3) signs of remorse, including such indices as performing acts indicating the presence of remorse or giving "indications he understands the nature and magnitude of the offense;" (4) the crime was the result of significant stress; (5) battered woman syndrome; (6) lack of any significant history of violent crime; (7) the prisoner's age reduces the probability of recidivism; (8) realistic plans for the future upon release, or development or marketable skills that can be put to use upon release; and (9) institutional behavior and activities "indicating an enhanced ability to function within the law upon release." CAL. CODE REGS. § 2281(d). None appears to be supported by the evidence in Glover's case.

1  unreasonably endangers public safety").  The standard is satisfied if the denial is supported by

2  evidence on the ultimate conclusion the prisoner's release would "pose an unreasonable risk of danger

3  to society."  CAL. CODE REGS. § 2404(a).

> To determine whether the some evidence standard is met "does not
> require examination of the entire record, independent assessment of the
> credibility of witnesses, or weighing of the evidence.  Instead, the
> relevant question is whether there is any evidence in the record that
> could support the conclusion reached [by the BPH]. . . . [¶] [The] some
> evidence standard is minimal, and assures that "the record is not so
> devoid of evidence that the findings of the . . . board were without
> support or otherwise arbitrary."

Sass, 461 F.3d at 1128, 1129, *quoting* Hill, 472 U.S. at 455-56, 457.

### B.   Plea Agreement Violation Claim Is Without Merit

Glover argues during his May 19, 2006 suitability hearing, the District Attorney and the BPH

violated the terms of his December 11, 1995 plea agreement in Case No. 25179.  (Pet. Statement Of

Facts p. 6.).  He "exchanged his Not Guilty plea [for a guilty plea to voluntary manslaughter in1995]

in order to get an eight year sentence . . . to be run concurrent" with Case No. 267714.  (Id. pp. 12-13.)

He contends his continued confinement beyond eight years violates that plea bargain, with the BPH

purportedly "using petitioner's plea and conviction against him in consideration of parole, and stating

that petitioner will serve a period longer than eight years, because he was really guilty of murder."

(Id. p. 13.)  He characterizes his manslaughter conviction as "inactive and by operation of law, a

legally discharged case," whereas purportedly the "major theme in the May 19, 2006 Board Hearing

was concerned with Case #-25179."  (Id. pp. 10, 8.)  "Because the Prison Board is not asseeding [*sic*]

to the Bargain Plea, petitioner requests the Plea be [va]cated."  (Id. 13:22-23.)

Plea agreements "must be construed in accordance with state law."  Buckley v. Terhune, 441

F.3d 688, 690 (9th Cir. 2006).  "In California, plea agreements are construed in the same manner as

all other contracts."  Id. (holding a defendant who pled guilty to second-degree murder was entitled

to specific performance of the sentencing provision setting a maximum prison term of 15 years).

Failure to interpret a plea agreement as a contract can result in a decision contrary to clearly

established federal law.  *See* Santobello v. New York, 404 U.S. 257, 262 (1971) (a prosecutor's

promise constituting part of the inducement or consideration for a plea must be fulfilled); Ricketts v.

1   Adamson, 483 U.S. 1, 11-12 (1987) (permitting the State to enforce a plea agreement term the parties

2   would be returned to *status quo ante* without violating the Double Jeopardy Clause if the defendant

3   breached his agreement to testify against others).  Federal courts will enforce a plea bargain upon a

4   showing of objective evidence concerning the terms of the bargain allegedly breached.  *See* Buckley,

5   441 F.3d at 694-95 (finding sufficient evidence the petitioner only agreed to a maximum term of

6   fifteen years, not fifteen-years-to-life).

7          Glover identifies no breach of any term of his 1995 bargain.  The agreed eight-year sentence

8   was imposed and ran currently with the indeterminate life sentence he was already serving for the

9   robbery conviction.  He offers no evidence to suggest the plea agreement entailed any promise

10  associated with its effect on future parole determinations while he remained incarcerated serving a

11  longer, concurrent sentence for a separate offense.  (*See* Pet. Exh. B, Case No. 25179 Change of Plea

12  Hearing transcript; Pet. Exh. A, Case No. 25179 Abstract of Judgment.)  *Cf.* Brown v. Poole, 337 F.3d

13  1155, 1159-60 (9th Cir. 2003) (finding an enforceable prosecutorial promise defendant would be

14  paroled after serving a specific period of time if she behaved in prison in exchange for her guilty plea).

15  California statutes and regulations provide a prisoner's criminal history is an important consideration

16  in the parole suitability context.  *See* CAL. PEN. CODE  § 3041(b); CAL. CODE REGS. tit. 15, §

17  2281(c)(1).  The state court reasonably rejected his arguments on this issue, foreclosing federal habeas

18  relief on a plea agreement breach ground.[14]

19          **C.       Ample Evidence Supports The Initial Denial Of Parole**

20         Glover's 2004 BPH panel informed him its determination whether to grant a parole date was

21  controlled by the California Penal Code and Regulations and would include consideration of the nature

22  and number of crimes associated with his current commitment, his prior criminality, his social history,

23  and his behavior and programming since his commitment.  (Pet. Exh. G, 7:15-19.)  After reviewing

24  the record, giving Glover an opportunity to speak, hearing from his counsel, and hearing from the

25  District Attorney, the panel denied Glover parole for two years, finding him not suitable because he

26  _____

27         [14]  Not only did the state court reasonably find the panel plainly treated the manslaughter conviction
    as such, not misconstruing it as a murder conviction (Ans. Exh. 2), but also multiple other unsuitability factors
28  cited by the panel were unequivocally supported by ample evidence warranting denial of parole.

"would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."  (Pet. Exh. G, 52:9-12.)

> [T]he Panel finds that the prisoner still has quite a ways to go, and that the prisoner needs to intensify his efforts in self-help programs, the kinds that would enable him to be able to face, discuss, understand, and cope with stress in a non-destructive manner.  Until enough progress is made, the prisoner continues to be unpredictable and a threat to others.  The prisoner's gains are recent.  He must demonstrate the ability to maintain his gains over an extended period of time. . . . .[H]is positive gains does [*sic*] not outweigh the factors of unsuitability.

(Pet. Exh. G, 56:13-57:6.)

The recited grounds for the result were, among others:  he had committed a series of crimes qualifying him as a habitual criminal; the stabbing crime demonstrated "a callous disregard" for the suffering of another person;[15] he had a prior history of manslaughter and "a record of assaultive behavior and escalating pattern of criminal conduct;" disregard for societal laws and rules dating back to his youth; failed performance on numerous previous probation and parole grants; a pattern of unstable social history; use of drugs and alcohol beginning at a very early age; only limited programming while in prison; serious disciplinary infractions; no recent psychological evaluation because Glover refused in September 2003 to participate in that process, so that "the Board can only conclude by his non-participation that he's not suitable for parole from a psychological standpoint;" and although his parole plans were not investigated, they were "moot" because of the panel's finding of unsuitability.[16]  (Pet. Exh. G, pp. 52-56.)

---

[15]  "The prisoner stabbed Mr. Marchy with a weapon after a domestic dispute about his girlfriend. . . . . Then there was a manslaughter. . . . So there's multiple victims involved in separate incidents.  The offense was carried out in a dispassionate, calculated manner.  Certainly the victim was abused. . . , and we're not talking about one, we're talking about a series of events.  The first event on Mr. Marchy, certainly that showed a callous disregard.  Mr. Tillman, who died as a result of the altercation, and the prisoner was convicted of manslaughter . . . ." (Pet. Exh. G, 57:17-58:6.)

[16]  "And the substance abuse in a prison setting, that showed a callous disregard for rules and regulations that's established to protect a structured environment like a prison or a jail setting.  The prisoner has a record of violent behavior. He has extensive criminal history and it's too extensive to re-articulate, it's already on the record.  And I guess it would suffice to say that it's so extensive that he qualified for the habitual criminal act.  History of unstable or tumultuous relationships with others. . . . [D]isciplinaries are as recent as 1999. . . . [L]ack of a psych report, the prisoner refused to participate. . . . The prisoner has not completed the necessary programming which is essential to his adjustment and needs additional time to gain such programming.  Certainly at the top of the prisoner's list should be a substance abuse program based on his long history of criminality and . . . the record the substance abuse related arrests would indicate the prisoner has a long ways

- 12 -

1    The facts of the indeterminate sentence crime were read into the record from the appellate

2  decision.  In pertinent part, a county sheriff responded to a call on March 1, 1991 at Steve Marchy's

3  house, finding him lying on a couch.  He said he had been stabbed by Ron Glover.  (Pet. Exh. G, p.

4  15.)  Marchy had met Glover before the incident, but was not well acquainted with him.  Marchy told

5  the officer Glover had asked him for money.  He handed his wallet to Glover when he had trouble

6  opening it because of the stab wound, telling Glover he could have "whatever I've got, just don't hurt

7  me anymore."  Glover said he only wanted $20 dollars, "enough for a fix."  Marchy was treated at a

8  hospital and released. (Id. 16:4-14, 18:4-5.) At trial, Marchy recanted his earlier identification of

9  Glover,[17] and Glover's counsel had added to the file a January 2004 declaration from Marchy to the

10  same effect.[18]  (Pet. Exh. G, 18:13-19:2.)  Glover's jury nevertheless convicted him of the robbery and

11  assault, apparently finding Marchy's recantation not credible, he was sentenced accordingly, and the

12  appeals process resulted in no modification of the conviction or sentence. The BPH is not empowered

13  to revisit the correctness of convictions for underlying crimes in a parole suitability proceeding.  The

14  panel reminded Glover they were not convened to argue whether Glover was guilty of the crime or

15  not:  "We accept as true the findings of the court. . . ."  (Id. 19:11-12.)   Similarly, this Court must

16  presume the determination of a factual issue by a state court is correct.  28 U.S.C. § 2254(e)(1);

17  Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc).

18    The presiding commissioner also recited on the record the circumstances of Glover's March

19  1992 controlled substance conviction while in prison (Pet. Exh. G, 20:1-5) and the circumstances and

20  result of his  December 1995 conviction for the voluntary manslaughter in 1991 while he was out of

21  custody on bail (Id. 20:7-11).  The commissioner also read into the record Glover's version of those

22  crimes.  (Id. 20:14-21:6.)  The panel reviewed the detail of Glover's adult arrest record from his

24  to go in that area."  (Pet. Exh. G, 58:8-59:6.)

25  [17] Marchy apparently testified Glover was "not the Ron Glover who stabbed him," but rather "[a]nother
26  Ron Glover, who was younger, and a bit taller than Appellant, stabbed him," and had tattoos on his arm and
   neck, unlike the defendant."  (Pet. Exh. G, 16:24-17:5).

27  [18]  The January 2004 Marchy Declaration, as described on the  record, requested Glover be released
28  from prison because a different Ronnie Glover had stabbed him in 1991, and confirmed he had so testified at
   Glover's preliminary hearing and trial in Case No. 267714.  (Pet. Exh. G, 37:1-38:8.)

lengthy rap sheet, covering crimes and convictions back to the mid-1960's, comprised of probation and parole violations, narcotic convictions, assault with a deadly weapon on a police officer, escapes from custody, safety violations, and vehicle theft, among other things, "a pretty lengthy CDC history." (Pet. Exh. G, pp. 21-23.)  His personal history characteristics of record were "a wonderful childhood," two marriages but no children, and abuse of drugs and alcohol.  (Id. 23:7-14.)  He had admitted he drank all types of alcohol between the ages of 14 and 17, but "his alcohol consumption declined at age 17 when he started using heroin."  (Id. 24:21- 25:5.)  He showed little inclination to address his substance abuse problem.

> Regarding drug use, the defendant states that he has used heroin for the past 30 years.  He also used cocaine, smoked marijuana, and the defendant admits that he has a drug problem and states that he's been to the California Rehabilitation Center more than once.  However, he feels that the counseling offered is idle counseling.

(Pet. Exh. G, 25:5-12.)

The panel reviewed and elicited Glover's input regarding his conduct and accomplishments while serving his indeterminate sentence.  He received good work reports from the library clerk, he got his high school diploma while in custody, he participated in a vocational program, and he had started a diesel mechanic trade program but did not complete it. (Pet. Exh. G, 26:20-27:16.)  His self-help record was limited to participation in an Aryan religion.  (Id. 27:21-28:17).  His disciplinary record included five "115's":  in October 1996 for refusing a urinalysis, conduct the CDC assumes means the inmate is using drugs, and officials found residue of heroin or an opiate; failure to report to work on a day in January 1996, a day in July 1998, and a day in October 1998; and a mutual combat in October 1999.  (Id. 28:17-27). He had also assaulted an inmate in the County jail while he was awaiting a court appearance..  He had been discipline-free since 1999.  (Id. 29:1-8.)  He had a total of nine "128(a)'s," most recently in December 2001 for having extra guitar string.  (Id. 29:8-10.)

Glover's correctional counselor concluded he would be unpredictable if released, although the panel acknowledged the counselor "probably . . . didn't know you enough and didn't feel comfortable making any other assessment at this time." (Pet. Exh. G, 29:20-30:3.)  Glover had declined to submit to a psychological evaluation for the hearing.  (Id. 30:3-8.)  The panel therefore referred to a three-page report prepared by a staff psychologist in September 1997.  The diagnostic impressions at that

07cv0306

time were polysubstance dependency, history of conduct disorders as a youth, and anti-social personality disorder.  (Id. 30:9-19.)  Glover had a Global Assessment of Functioning score of 80, indicating he was relating well to others.  His antisocial characterological adjustment was aggravated by abuse of numerous drugs and alcohol.  (Id. 30:19-31:2.)  He was described as "an impulsive individual with a long criminal history, bright, street smart, well acquainted with how to do prison time, [n]ever been noted to have any mental problems or difficulties besides from being a drugee, and throughout his life he has been hedonistic and impulsive with a quick temper and disregard for the law," but "currently doing relatively well in his current program and structure."  (Id. 31:2-14.)  The report concluded:

> The instant offense and his behavioral pattern in these years indicates a high degree of risk to the community and drug abuse was a significant contributing factor.  Because of the serious drug abuse, the inmate should seriously consider substance abuse treatment and a drug-free lifestyle.  Subject candidly relates that he may continue to use drugs when he is free as long as he can control it and it doesn't hurt anyone else.  He paradoxically also acknowledges that most of his criminal history is related to drugs.

(Pet. Exh. G, 31:14-24.)

Glover's counsel augmented the record with two chronos:  one for attendance at Narcotics Anonymous ("NA") from "12/3/03 through 2/24/04 for a total of three months, sincere attitude, wants to live a drug-free lifestyle, shares all experiences and doing well" (Pet. Exh. G, 32:4-12); and one from a community resource manager indicating Glover is "a practitioner of Odinism . . . Asatru," a religion Glover described for the panel.  (Id. 32:12-34:22.)  He confirmed he had only attended NA for three months "and I won't be going back to NA anymore, because of the fact that this, the NA program is an excellent program, I think it's an excellent program and the AA too" but "I can't sincerely go to this program anymore because. . . it overlaps into a disbelief system that's a concern to Odinism," creating a religious conflict.  (Id. 34:22-35:8.)  He stated he was going to try to find another self-help program to address "the narcotic problem that I have."  (Id. 35:8-10.)

Glover's parole plans proposed he live with his brother and his wife in Empire, California and work for a family business owned by his brother's daughter as a courier.  (Id. 36:20-27.)  He identified his ultimate goal as becoming a paralegal.  (Pet. Exh. G, 35:26-36:11.)  He expected letters of support

to be "forthcoming."  (Id. 36:13-15.)  Glover declined to discuss the crime.

The District Attorney addressed the panel to oppose granting Glover parole.[19]  He argued parole consideration was premature until Glover substantially upgraded his vocational training and drug rehabilitation, showed some sincere remorse and insight into his crime rather than continuing to deny his guilt of the commitment offense, and until he remained discipline-free for more than just two and one-half years.  (Pet. Exh. G,. 47:8-19.)  He further challenged as unacceptably vague Glover's parole plans, particularly when the appellate record reflected Glover and his brother, both documented drug users, were living together in the same drug-influenced lifestyle in 1991 which led to the robbery and assault conviction, and the arrangement would be impermissible under the parole term Glover not be with narcotics users.  (Pet. Exh. G, pp. 40-47.)  (Id. pp. 49-51.)  Glover himself briefly stated:

> INMATE GLOVER:  Yeah, I would like to say that there's no doubt that I've been extremely antisocial for my life, and that I have an extensive record.  And that, you know, I really, I'm really not asking for a parole, if I get one, that's okay with me, I can accept that, and I want to become in society a working part of society and contribute to society.  If I don't get a parole, well that's your decision and I won't hold it against you, you know.  That's all I've got to say.

(Pet. Exh. G, 51:7-17.)

This court finds, from the record extracted above, the 2004 BPH panel properly considered the codified factors of suitability and unsuitability and identified ample evidence to support its denial of parole, satisfying the "some evidence" due process standard.  Not only does the record support the determination Glover would pose an unreasonable public danger if released without more

---

[19]  The District Attorney emphasized: Glover's long criminal history as indicative of a substantial threat to society if released; his three separate commitment offenses as representative of his habitual criminality; one of the commitment offenses was "voluntary manslaughter, the killing of William Tillman," expressing the opinion Glover's statements the killing was accidental and he was remorseful were a lie in consideration of discrepancies with his statements to witnesses at the time and his admission to correctional officers when he was arrested; the drug commitment offense is consistent with his lifelong addiction and a testament to his finding ways to obtain them; his statement in 1997 to the staff psychiatrist he would continue to use drugs when he is released; the robbery offense was a violent assault to rob a fellow drug user for dope, irrespective of Glover's assertion he is innocent of that crime; the law assumes the inmate is guilty of the crime for which he was convicted by a jury as upheld on appeal, discrediting both Glover's contention and Marchy's suspect recantation after he had initially identified Glover as the robber; his disciplinary record during his custody, including violence and narcotics issues, the very crimes for which he is serving time; multiple prior parole violations; minimal efforts at continued vocational education while in CDC; no evidence of sincere commitment to NA or AA, and only a short participation just before the parole hearing, with admitted lack of intent to continue; high likelihood he will reoffend due to his severe drug problem; and the "high risk" of dangerousness from the most recent psychological evaluation.  (Pet. Exh. G, 40:26-47:8.)

1   rehabilitation and self-control progress, but also to support the findings on the particular factors the

2   BPH relied on to reach that conclusion.  Accordingly, habeas relief on grounds the 2004 BPH panel

3   violated Glover's due process rights is **DENIED**.

**D.   Ample Evidence Supports The Subsequent Denial Of Parole**

5   At the conclusion of the March 2004 suitability hearing, the BPH panel advised Glover to

6   prepare for his next hearing two years hence, making specific recommendations:

> [O]ne, become and remain disciplinary-free. . . . Upgrade vocationally
> and educationally. . . and in the self-help programs, the kinds I've
> already talked about, substance abuse, anger management, self-control,
> the whole spectrum in personal type of self-help programs should be
> taken.  The Panel is requesting a new psychological evaluation be
> completed.  We're requesting that the clinician take a look at the
> prisoner's violence potential in the free community, the significance of
> alcohol – we think that's real important – the significance of alcohol
> and drugs as they relate to the commitment offense, the extent to which
> the prisoner has explored the commitment offense and come to terms
> with the underlying causes.  Unless you participate, unless you talk
> with the psychiatrist, we have no way of knowing that, we have no way
> of knowing from the psychological standpoint whether or not there's
> any need for further therapy treatment while incarcerated.

(Pet. Exh. G, 59:7-60:9.)

Glover received a Subsequent Parole Consideration Hearing on May 19, 2006, where he was

not represented by counsel.  (Pet. Exh. AA.)  The hearing was again "conducted pursuant to Penal

Code Sections 3041 and 3042, and the Rules and Regulations of the Board of Parole Hearings

governing Parole Consideration Hearings for life inmates." (Pet. Exh. AA, 5:16-27.)  When asked if

he would be speaking about the commitment offense (referring to the Marchy robbery and stabbing),

he responded:  "Well, I will be saying that I'm not guilty, is what I'll be saying basically."[20]  (Pet. Exh.

AA, 16:26-27:14.) The panel reminded him "the purpose of today's Hearing is not to revisit your trial

. . .[a]nd it's  not to revisit the crime other than to read into the record just what occurred" (Id. 22:9-

15), he stood convicted of the offense, and the panel must accept the findings of the court (Id. 21:8-

14).  Glover presented a number of legal documents associated with his trial and investigative matters

the presiding commissioner noted "don't have a lot of bearing on the issue of suitability" and would

---

[20]  His file contained another statement from Marchy, dated in February 2006, again declaring Glover
was not the person who stabbed him, but rather a "different Ronnie Glover stabbed me in 1991." (Id.  42:1-6.)

not be considered by the panel.  (Id. at 44:3-8.)

The panel heard summation from the District Attorney recommending Glover not be released on parole.  (Id. at 71-72.)  Glover spoke on his own behalf, defending his Christian Paganism and Odinist religion, describing the heroin- and argument-induced stabbing death of Tillman as accidental while both were armed with knives.  When directed to address the issue of suitability for release on parole rather than the underlying crimes, he stated he wanted to be released based on his explanations associated with the prosecution of that case, and based on the Marchy affidavit he was not the robber and was therefore wrongly convicted, concluding insofar as he is "not guilty of the charge and the victim said that he wants me on the streets, I think that alone should make me eligible for parole."  (Id. at pp. 72-77:20-23.)  A Tillman family member read into the record a statement from Tillman's mother urging that Glover remain in prison.  (Pet. Exh. AA, pp. 78-83:5-8.)

The rationale and result of the 2006 proceeding were essentially the same as at his initial suitability hearing.  The panel denied parole based on its finding Glover was "not suitable for parole and would  pose an unreasonable risk of danger to society or a threat to public safety" if released (Pet. Exh. AA, 84:8-14), reviewing the evidence of record and reciting as its reasons many of the same conclusions reached by the 2004 BPH panel.  (Pet. Exh. AA, pp. 84-88.)  In addition:

> So far as the additional findings the Panel makes, is that [*sic*] with respect to your gains the Panel noted that you have no gains and you are going to have to demonstrate an ability to maintain these over an extended period of time.  And again the Panel noted that you didn't comply with the Panel's recommendation that you remain discipline free in 2004.

(Pet. Exh. AA, 90:4-20 (noting "this rather dismal performance that you had in the 115s. . . .").)

The result is supported by ample evidence.  In the period since his 2004 initial parole hearing, he received a 115 for possession of about five gallons of inmate-manufactured alcohol in February 2005.  In April 2005, he threatened to sue a librarian over not making copies of some documents he wanted to submit to the Supreme Court for his appeal in an incident that had caused her to sound her alarm. He received another115 in December 2005, originally written up as an assault on staff, alleging he squirted perfume at someone.  (Id. pp. 52-59.)  The 2006 panel characterized Glover's disciplinary infractions since the last hearing as arising from his "inability to listen to the recommendation of the

- 18 -

1   previous panel."  (Id. 88:16-17.)

2           DEPUTY COMMISSIONER WEAVER: . . . The problem is that you
        haven't maintained completely disciplinary free behavior pattern since
3       your last Board appearance, which is not in your best interest.

4           INMATE GLOVER;  I agree.

5   (Pet. Exh. AA, 59:6-11.)

6           In colloquy with Glover, the panel reviewed his various crimes leading up to the commitment

7   offense.  (Pet. Exh. AA, pp. 22-33.)  The panel also reviewed with him the contents of a new and

8   unfavorable psychological report from March 2006 (Pet. Exh. AA, pp. 33-38), relying in particular

9   on its assessment:  "If released at this time he would most likely return to drug use and then to crime

10  to pay for his habit" although "[i]f he continues to be abstinent for a significant amount of time and

11  gains insight concerning the needs that prompted his drug use he might be able to maintain law

12  abiding existence in the community."  (Pet. Exh. AA, 89:9-16.)  The doctor  concluded:

13          Inmate Glover's life of crime generally stems from his drug use and his
        dissatisfaction with a stayed [sic] law abiding existence.  Unfortunately
14      apart from improving his academic, legal and employment skills, he
        has made few substantive changes.  In personality inmate Glover is still
15      a person who chose crime over legitimate employment.  However, he
        is now much older and he may be becoming tired of crime and
16      subsequent incarceration.

17  (Pet. Exh. AA, 63:22-64:5.)

18          The doctor suggested Glover would "benefit from participation in the Celebrate Recovery

19  Program on the Three Yard."  Glover told the panel that program "is based on a Christian ethic and

20  principles, and I'm not completely in agreement with their contracts that they have you sign."  (Pet.

21  Exh. AA 64:8-17.)  He stated he had was participating in a program for narcotics abusers, a "Spiritual

22  Pagan Correction group" teaching "about courage, trust and loyalty and the virtues of man as opposed

23  to the Christian" AA or NA approach.  (Pet. Exh. AA 51:20-25.)  He confirmed all his prior robbery

24  offenses were committed to get drugs or money to buy drugs, and he continued to use alcohol and

25  drugs in prison even after his 2004 hearing.  (Id. pp. 67-70.)

26          The panel found Glover's parole plans, as described in a January 2006 report, no longer

27  included a viable residential option.  He had proposed to live with his mother and to work in

28  construction for his nephew, with a second employment possibility with his niece.  (Pet. Exh. AA, pp.

38-39.)  By May, his mother had been removed from her home to a care facility.  (Id. 89:6-21.)  His employment plans were vague, and the panel expressed concern he might not have a marketable skill due to his lack of a vocational certificate.  (Id. 89:21-90:1.)  The circumstances of the commitment offenses, Glover's criminal history and callousness, and the new psychological evaluation convinced the panel "a longer period of observation and evaluation of the prisoner is going to be required before the Board could find that you are suitable for parole," adding the same recommendations the 2004 panel had given him to upgrade himself.  (Pet. Exh. AA, 90:24-92:12.)  The record easily substantiates the due process evidentiary standard is satisfied.  The psychological evaluation and his continued disciplinary infractions while in prison, standing alone, support denial of parole on grounds he would pose an unreasonable public danger if released without more rehabilitation.

Glover also attacks the conduct of the parole hearings as denying him due process by the use of unreliable evidence and misstatements by the prosecutor.  However, the issue of credibility of the information was for the hearing officers to determine based on the record before them.  Furthermore, the Board's decisions were based on evidence in the record, the weight of which was not lessened by the alleged unreliable evidence and misstatements.

Accordingly, for the reasons set forth herein, habeas relief on Glover's claim the 2006 BPH panel violated his due process rights is **DENIED**.

### E.    State Law Claims

Only errors of federal law warrant federal habeas relief.  28 U.S.C. § 2254(a); Estelle, 502 U.S. at 67-68.  Federal courts may not revisit state law determinations on state law issues.  Oxborrow, 877 F.2d at 1400; Himes, 336 F.3d at 852.  Habeas petitioners cannot transform state law issues into federal claims "merely by asserting a violation of due process."  See Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996).  Those principles dispose of Glover's challenges to the conduct of his suitability hearings, the consideration of police reports, and his theories of laches and estoppel.  Accordingly, his pendent claims are **REJECTED**.

///

///

///

07cv0306

1  **III.    CONCLUSION AND ORDER**

2          For all the foregoing reasons, **IT IS HEREBY ORDERED** Glover's federal habeas petition

3  is **<u>DENIED</u>** in its entirety.  The Court finds no basis for a certificate of appealability.  Judgment shall

4  be entered denying the Petition and denying a certificate of appealability.

5          **IT IS SO ORDERED**.

6  DATED:  November 5, 2009

7

8                                          _____

9                                          Honorable Barry Ted Moskowitz
                                           United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07cv0306